# IN THE
# UNITED STATES DISTRICT COURT
## FOR THE
## DISTRICT OF MARYLAND

JENNIFER FINN
14 Crovo Lane
Fredericksburg, VA 22405

and

KATHERINE MULDOON
5195 Old Solomons Island Road
Lothian, MD 20711

     *Plaintiffs,*

                           Civil Action No:

vs.

THE HUMANE SOCIETY OF THE UNITED STATES
1255 23rd Street NW, Suite 450
Washington, DC 20037

     Resident Agent:
     CSC-LAWYERS INCORPORATING SERVICE COMPANY
     7 St. Paul Street, Suite 820
     Baltimore, MD 21202

     *Defendant.*

**-o0o-**
## COMPLAINT
(Jury Trial Requested)

Plaintiffs Jennifer Finn and Katherine Muldoon, by and through their

attorneys, Francis J. Collins and Kahn, Smith and Collins, P.A., hereby sue

1

Defendant The Humane Society of the United States, and, in support thereof, state as follows:

## I. INTRODUCTION

1.     Plaintiffs Jennifer Finn and Katherine Muldoon (hereinafter "Finn," "Muldoon," or "Plaintiffs") were employees of the Humane Society of the United States ("HSUS").  Finn, an employee with HSUS for ten years, had been working remotely from her home for the last four.  Muldoon was offered her position on December 21, 2021, and began work on January 18, 2022.  She was working remotely from her home for her entire time as an employee with HSUS.

2.     On November 10, 2021, HSUS emailed its employees to inform them of a vaccine mandate for all its staff, requiring compliance by January 4, 2022.  Finn received notice at that time.  Muldoon was interviewed on November 2, 15, and 18 of 2021.  During the interview process and at the time of her offer, she was told that the vaccine was not yet mandatory, and there was no mention of a vaccine requirement in her offer letter.  It was not until a phone call with a human resources staff member on January 6, 2022, that she was informed that the vaccine was mandatory as a condition of employment.  At that point and for several days following, Muldoon asked for the policy from various individuals at HSUS but did not receive one until her start date.

3.      On November 22, 2021, Finn filed a request for religious exemption from the vaccine.  HSUS denied the request without explanation on December 2, 2021.  When Finn inquired regarding an appeal process, HSUS responded that all decisions were final.  Finn was fired on January 3, 2022.

4.      On January 25, 2022, Muldoon filed a request for religious exemption from the vaccine.  HSUS denied the request without explanation on February 1, 2022.  Muldoon was fired on February 7, 2022.

5.      Neither Plaintiff was provided a reason for the denial of their requests. HSUS's refusal to grant the requests was a direct violation of Title VII of the Civil Rights Act of 1964.  In implementing and enforcing its mandate, HSUS subjected Plaintiffs to unlawful medical inquiries and examinations under the Americans with Disabilities Act ("ADA").

## II. JURISDICTION

6.      Plaintiffs have fulfilled the jurisdictional requirements of Title VII and the ADA by filing charges of discrimination with the Equal Employment Opportunity Commission ("EEOC") and receiving a Right to Sue notice from the EEOC for each charge, in compliance with 42 U.S.C. § 2000e-5(f)(1) and §12117(a).

7.      HSUS is subject to the provisions of Title VII and the ADA, as it employs more than fifteen employees under 42 U.S.C. § 2000e(b) and 42 U.S.C. § 12111(5)(A).

8.      This Court has original subject matter jurisdiction over this action, as the claims therein arise under the Constitution and the laws of the United States, pursuant to 28 U.S.C. § 1331.  This Court has personal jurisdiction over HSUS, as the organization transacts business in the District of Maryland, in keeping with Fed. Rule Civ. Pro. 4(k)(1)(A) and Md. Code § 6-103(b)(1) and (2), and as the exercise of this Court's jurisdiction in this case would comport with the due process requirement of the Fourteenth Amendment of the United States Constitution. *Carefirst of Maryland, Inc. v. Carefirst Pregnancy Centers, Inc.*, 334 F.3d 390, 396 (4th Cir. 2003).

9.      Venue is proper in the District of Maryland under 28 U.S.C. § 1391(b)(2) and (3), because all the events or omissions giving rise to this claim occurred in Maryland, and because HSUS is subject to this Court's personal jurisdiction with respect to this action.

### III. PARTIES

10.      Plaintiffs were, at all relevant times, employees of HSUS until they were fired.

11.      HSUS is a nonprofit animal rights organization with multiple locations in the United States.  HSUS is incorporated in Delaware with locations in Fallston and Baltimore, Maryland.  Plaintiffs were employed through HSUS's now-closed Gaithersburg, Maryland location.

## IV. EXHAUSTION OF ADMINISTRATIVE REMEDIES

12.    On February 18, 2022, Finn filed a timely Charge of Discrimination against HSUS with the Baltimore Field Office of the EEOC, Charge No. 531-2022-01580, charging it with unlawful religious discrimination and unlawful disability discrimination in connection with her termination.

13.    By notice dated May 24, 2023, Finn received a "Notice of Right to Sue" notice from the EEOC (Ex. 1).

14.    This lawsuit has been timely filed within 90 days of Finn's receipt of the EEOC's Right to Sue Notice.

15.    On February 25, 2022, Muldoon filed a timely Charge of Discrimination against HSUS with the Baltimore Field Office of the EEOC, Charge No. 531-2022-01380, charging it with unlawful religious discrimination and unlawful disability discrimination in connection with her termination. On May 25, 2023, Muldoon submitted a Request for Right to Sue Notice to the Baltimore Field Office of the EEOC.

16.    By notice dated July 19, 2023, Muldoon received a "Notice of Right to Sue" notice from the EEOC (Ex. 2).

17.    This lawsuit has been timely filed within 90 days of Muldoon's receipt of the EEOC's Right to Sue Notice.

## V. FACTUAL ALLEGATIONS

### A. HSUS's Vaccine Mandate

18.    In a November 10, 2021, email to its employees, HSUS instituted a company-wide vaccine mandate with a full compliance deadline of January 4, 2022. The email stated that employees not in compliance would be fired on January 3, 2022.  The email made clear that the policy applied to remote workers as well but never explained its rationale for applying the policy to remote workers.

19.    A follow-up email sent on the same day was addressed to employees without a record of vaccination and said, in part: "If you wish to apply for a religious or medical exemption from the COVID-19 vaccine, please submit the appropriate form below to HR Assist by 8pm ET, Wednesday, November 24. You will be notified if your exemption request has been accepted or denied by 8pm ET, Tuesday, November 30."

### B. Finn's Request for Religious Exemption

20.    Finn requested to be exempt from the vaccine mandate, as a reasonable accommodation of her sincerely held religious beliefs.

21.    In her request, Finn cited Catholic teachings aligning with her faith that would be betrayed by getting vaccinated against COVID-19.  She wrote, in part: "My conscience and heart are guided by my faith in God the Father and his son Jesus Christ.  The HSUS policy would unjustly force me to act in betrayal to my

6

conscience and faith" (Ex. 3).  She elaborated further on this request during her two follow-up interviews (discussed below).

22.    Finn submitted her request on a form provided by HSUS (Ex. 4).  This form required Finn to attest that the information in her exemption request was "true and accurate to the best of [her] knowledge."  In addition, after filing, Finn was contacted via email inquiring whether, if approved, she was willing to engage in disease mitigation measures such as masking and testing as requested by HSUS.  She replied that she was willing to do so.

23.    When Finn filed for a religious exemption, HSUS did not start from the proposition that the employee's religious views were sincerely held unless there was objective evidence to prove otherwise, as required under Title VII.

24.    HSUS did not accept that Finn could have a sincere conscientious and religious objection to the vaccine.  Instead, it interviewed Finn twice regarding her sincerely held religious beliefs, interrogating her about previous vaccinations and probing for more information regarding her already articulated religious beliefs and how they conflict with the vaccine.

25.    Despite her complete and honest answers, on December 2, 2021, Finn received an email from HSUS informing her that her request to be exempt was denied. The notice did not provide any explanation, and merely said that Finn's "request ha[d] been denied," and she must comply with the vaccine mandate, or her

last day of employment would be January 3, 2022.  HSUS did not elaborate further, nor did it allow Finn to appeal the decision.  It is believed, and therefore averred, that to the extent HSUS granted any religious exemption requests, it did so arbitrarily.

### C. Finn's Remote Position

26.     The fact that Finn worked mostly remotely since 2016, combined with her willingness to mask and social distance at work events, demonstrates that HSUS could have accommodated her with ease.

27.     When Finn was required to attend events as part of her work duties, all events were held at off-site locations, and all such events lacked any vaccine policies and allowed unvaccinated people to attend.

### D. Finn's Involuntary Termination of Employment

28.     On January 3, 2022, HSUS terminated Finn.

29.     After her termination, Finn unjustly suffered economic losses, including but not limited to loss of salary, employment benefits, pension benefits and other perquisites of employment.  Finn also suffered non-economic injuries such as mental pain and anguish, embarrassment, and humiliation.

30.     HSUS did not offer Finn a leave of absence, whether paid or unpaid. At no time since terminating Finn has HSUS offered to reinstate Finn.

31.    HSUS was attempting to coerce employees into making a medical decision which is not within the purview of an employer to make.  It is a medical decision that should, and legally, must, be left to the individual patient, after giving informed consent.  At no time did HSUS attempt to engage in informed consent.

### E. Muldoon's Request for Religious Exemption

32.    Muldoon requested to be exempt from the vaccine mandate, as a reasonable accommodation of her sincerely held religious beliefs.

33.    In her request, Muldoon cited the use of aborted fetal cell lines in the creation of the vaccine and the testing of the vaccine on animals as going against her spiritual and religious beliefs.  She wrote, in part: "[a]ccepting this vaccine would compromise the religious beliefs founded in my Christian upbringing that fetuses are individuals and did not consent to the use of their bodies in medical testing or production.  As such, taking this vaccine would make me complicit in an act that offends my spiritual and religious faith" (Ex. 5).

34.    Muldoon submitted her request on a form provided by HSUS.  This form required Muldoon to attest that the information in her exemption request was "true and accurate to the best of [her] knowledge."  In addition, after filing, Muldoon was contacted via email inquiring whether, if approved, she was willing to engage in disease mitigation measures such as masking and testing as requested by HSUS.  She replied that she was willing to do so.

35.     When Muldoon filed for a religious exemption, HSUS did not start from the proposition that the employee's religious views were sincerely held unless there was objective evidence to prove otherwise, as required under Title VII.

36.     After filing for an exemption, Muldoon participated in an interview with HSUS regarding the sincerity of her religious beliefs.  She was interrogated about previous vaccinations, her religious denomination, and what part of her beliefs conflict with receiving the COVID-19 vaccine.

37.     Despite her complete and honest answers, on February 1, 2022, Muldoon received an email from HSUS informing her that her request to be exempt was denied. The email did not provide any explanation, and merely said that Muldoon's "request ha[d] been denied," and she must comply with the vaccine mandate, or her last day of employment would be February 7, 2022.[1]  HSUS did not elaborate further, nor did it allow Muldoon to appeal the decision.  It is believed, and therefore averred, that to the extent HSUS granted any religious exemption requests, it did so arbitrarily.

---

[1] The original email erroneously listed January 7, 2022 as the last date of employment, but as the email was sent after that date and specified that Muldoon must receive her first dose of the vaccine by February 4, 2022, we correct the date here to the intended last day of employment, which is reiterated in HSUS's Position Statement.

### F. Muldoon's Remote Position

38.    The fact that Muldoon's work was conducted mostly remotely, combined with her willingness to mask and social distance at work events, demonstrates that HSUS could have accommodated her with ease.

39.    When Muldoon would have been required to attend events as part of her work duties, all events would have been held at off-site locations, and all such events lacked any vaccine policies and allowed unvaccinated people to attend.

### G. Muldoon's Involuntary Termination of Employment

40.    On February 7, 2022, HSUS terminated Muldoon.

41.    After her termination, Muldoon unjustly suffered economic losses including, but not limited to loss of salary, employment benefits, pension benefits and other perquisites of employment.  Finn also suffered non-economic injuries such as mental pain and anguish, embarrassment, and humiliation.

42.    HSUS did not offer Muldoon a leave of absence, whether paid or unpaid.  At no time since terminating Muldoon has HSUS offered to reinstate Muldoon.

43.    HSUS was attempting to coerce employees into making a medical decision which is not within the purview of an employer to make.  It is a medical decision that should, and legally, must, be left to the individual patient, after giving informed consent.  At no time did HSUS attempt to engage in informed consent.

11

## COUNT I
## RELIGIOUS DISCRIMINATION
## TITLE VII OF THE CIVIL RIGHTS ACT OF 1964
## (42 U.S.C. § 2000e *et seq.*)

44.    Plaintiffs incorporate by reference the allegations set forth in the Paragraphs above, as if fully set forth herein.

45.    Plaintiffs were "employees" within the meaning of 42 U.S.C. § 2000e(f).

46.    HSUS is an "employer" within the meaning of 42 U.S.C. § 2000e(b).

47.    Title VII of the Civil Rights Act provides that "[i]t shall be an unlawful employment practice for an employer … to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's … religion." 42 U.S.C. § 2000e-2. Accordingly, an employer must "reasonably accommodate to an employee's or prospective employee's religious observance or practice," absent "undue hardship on the conduct of the employer's business." 42 U.S.C. § 2000e(j).

48.    To establish a prima facie case of an employer's violation of the duty to reasonably accommodate an employee's religious observance or practice, an employee must prove "(1) he or she has a bona fide religious belief that conflicts with an employment requirement; (2) he or she informed the employer of this belief; [and] (3) he or she was disciplined for failure to comply with the conflicting

employment requirement." *U.S. Equal Emp. Opportunity Comm'n v. Consol Energy, Inc.*, 860 F.3d 131, 141 (4th Cir. 2017) (quoting *EEOC v. Firestone Fibers & Textiles Co.*, 515 F.3d 307, 312 (4th Cir. 2008)); *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). "If the employee establishes a prima facie case, the burden then shifts to the employer to show that it could not [reasonably] accommodate the plaintiff's religious needs without undue hardship." *Firestone Fibers & Textiles Co.*, 515 F.3d 307 at 312 (quoting *Chalmers v. Tulon Co. of Richmond*, 101 F.3d 1012, 1019 (4th Cir.1996)); *McDonnell Douglas*, 411 U.S. 792.

49.    Religious beliefs need not be rational—only sincere—in order to be protected under Title VII.  *Keene v. City and County of San Francisco*, No. 22-16567, 2023 WL 3451687, at *2 (9th Cir. May 15, 2023) (whether the belief that vaccines contained fetal cells was unfounded does not negate the belief as sincerely held).  In addition, "[O]verlap between a religious and political view does not place it outside the scope of Title VII's religion protections…."  *See* Section 12: Religious Discrimination,          https://www.eeoc.gov/laws/guidance/section-12-religious-discrimination.

50.    Here, Plaintiffs had bona fide religious beliefs that conflicted with HSUS's COVID-19 vaccine mandate.

51.    Plaintiffs informed HSUS of their beliefs in their requests for religious accommodations, which HSUS then denied.

52.    HSUS terminated Plaintiffs for not complying with the vaccine mandate.

53.    As explained above, HSUS was prohibited from questioning the sincerity of an employee's religious beliefs unless it was in possession of objective evidence that called that sincerity into question.  At no time did HSUS have any objective evidence that Plaintiffs' stated objections were not sincerely held.  Even if HSUS had any basis to believe Plaintiffs' opposition to the vaccine was secular in nature (which it did not), the follow-up interviews done with Plaintiffs should have cleared up any concerns.  Both Plaintiffs provided more than adequate explanations as to how their religious beliefs conflicted with receiving the COVID-19 vaccine. Despite this, HSUS disregarded Plaintiffs' interview answers and determined that Plaintiffs' beliefs were not sincerely held.  This attempt was unsuccessful in that regard because Plaintiffs' sincerity was true, but HSUS, nonetheless, imposed its view of morality, theology, ethics, and conscience, and rejected Plaintiffs' requested exemptions.

54.    Even if HSUS doubted the sincerity of Plaintiffs' religious beliefs, HSUS could have accommodated Plaintiffs without undue hardship by allowing them to wear a face mask, engage in social distancing, and/or undergo testing during any in-person duties. As the EEOC explains, an employer must consider whether the employee "works in a solitary or group setting or has close contact with other

employees or members of the public." *See* What You Should Know About COVID-19 and the ADA, the Rehabilitation Act, and Other EEO Laws, https://www.eeoc.gov/wysk/what-you-should-know-about-covid-19-and-ada-rehabilitation-act-and-other-eeo-laws.  In this case, HSUS failed to consider those factors and, if it had, those factors would have dictated against a vaccine mandate for Plaintiffs.

55.    In processing requests for religious accommodation, an employer should engage in an interactive process: "bilateral cooperation is appropriate in the search for an acceptable reconciliation of the needs of the employee's religion and the exigencies of the employer's business." *Ansonia Bd. of Educ. v. Philbrook*, 479 U.S. 60, 69 (1986) (internal citations and quotations omitted); *see also* U.S. Equal Emp. Opportunity Comm'n, EEOC-CVG-2021-3, Section 12: Religious Discrimination (2021), https://www.eeoc.gov/laws/guidance/section-12-religious-discrimination#_ftn221 ("This typically involves the employer and employee mutually sharing information necessary to process the accommodation request. Employer-employee cooperation and flexibility are key to the search for a reasonable accommodation.  If the accommodation solution is not immediately apparent, the employer should discuss the request with the employee to determine what accommodations might be effective").  During its interviews with Plaintiffs, HSUS did not discuss any possible accommodations.  Instead, it sent an email asking

if the Plaintiffs were willing to mask and test weekly if their exemption requests were approved – to which both Plaintiffs responded in the affirmative. Therefore, HSUS did not engage in a proper interactive process with Plaintiffs. Rather, it imposed its vaccine mandate as a *per se* rule.

56.    As a result of the above-mentioned discrimination, Plaintiffs suffered and will continue to suffer lost earnings, earning capacity, fringe benefits, severe emotional distress and mental anguish. HSUS is also liable for punitive damages because its conduct was intentional and malicious.

**COUNT II**
**DISABILITY DISCRIMINATION**
**UNDER THE AMERICANS WITH DISABILITIES ACT**
**(UNLAWFUL MEDICAL EXAMINATION OR INQUIRY)**
**(42 U.S.C. § 12101 *et seq.*)**

57.    Plaintiffs incorporate by reference the allegations set forth in the Paragraphs above, as if fully set forth herein.

58.    The ADA's prohibition on discrimination "include[s] medical examinations and inquiries." 42 U.S.C.A. § 12112(d)(1). HSUS's demand that employees disclose their medical and COVID-19 vaccination status constitutes a medical examination or inquiry. The ADA provides that employers "shall not require a medical examination and shall not make inquiries of an employee as to whether such employee is an individual with a disability…, unless such examination

or inquiry is shown to be job-related and consistent with business necessity." 42 U.S.C.A. § 12112(d)(4); 29 C.F.R. § 1630.13(b), 14(c).

59.    "Whether a medical inquiry is job-related and consistent with business necessity 'is an objective inquiry.'" *Coffey v. Norfolk S. Ry. Co.,* 23 F.4th 332, 339 (4th Cir. 2022) (quoting *Hannah P. v. Coats,* 916 F.3d 327, 339 (4th Cir. 2019)). An employer must have an objectively reasonable basis to believe that the employee cannot carry out the employee's duties. *Coffey,* 23 F.4th 332 at 336. "An employer's request for a medical examination is job-related and consistent with business necessity when: "(1) the employee requests an accommodation; (2) the employee's ability to perform the essential functions of the job is impaired; or (3) the employee poses a direct threat to himself or others." *Coats,* 916 F.3d at 339 (quoting *Kroll v. White Lake Ambulance Auth.,* 763 F.3d 619, 623 (6th Cir. 2014)). An employer must prove: (i) "that the asserted 'business necessity' is vital to the business," (ii) "that the examination ... genuinely serves the asserted business necessity," and (iii) "that the request is no broader or more intrusive than necessary." *Blake v. Baltimore Cty., Md.*, 662 F. Supp. 2d 417, 422 (D. Md. 2009) (quoting *Conroy v. N.Y. State Dep't of Corr. Serv.*, 333 F.3d 88, 97-98 (2d Cir. 2003); 42 U.S.C. §12112(d)(3)(1994); 29 C.F.R. §1630.14(b)(1998). The medical inquiries in this case were not job related nor consistent with business necessity.

60.    Here, HSUS made medical inquiries and required Plaintiffs to undergo a medical examination when it mandated that they receive the COVID-19 vaccination as a condition of their employment. HSUS further made a medical examination or inquiry when, in connection with its vaccine mandate, it inquired into Plaintiffs' vaccination status.

61.    Plaintiffs' ability to perform the essential functions of their jobs was not impaired by their status as unvaccinated.  There was no objectively reasonable basis for HSUS to believe that Plaintiffs were unable to carry out the essential functions of their jobs.  Plaintiffs were willing to continue remote work, wear face masks, socially distance, and/or submit to regular testing when in contact with others as part of their job duties. With these precautions in place, they could safely perform their job functions as they had been doing prior to their firings.

62.    COVID-19 is not an occupational hazard that has any particular relationship to Plaintiffs' job duties.  Rather, it is a disease or medical condition that arises as a result of living in the 21st century, not unlike other communicable diseases such as the flu, the common cold, HIV, and leprosy.  As the U.S. Supreme Court explains:

> That is not to say OSHA lacks authority to regulate occupation-specific risks related to COVID–19. Where the virus poses a special danger because of the particular features of an employee's job or workplace, targeted regulations are plainly permissible. We do not doubt, for example, that OSHA could regulate researchers who work with the

COVID–19 virus. So too could OSHA regulate risks associated with working in particularly crowded or cramped environments. But the danger present in such workplaces differs in both degree and kind from the everyday risk of contracting COVID–19 that all face. OSHA's indiscriminate approach fails to account for this crucial distinction— between occupational risk and risk more generally—and accordingly the mandate takes on the character of a general public health measure, rather than an "*occupational* safety or health standard." 29 U.S.C. § 655(b) (emphasis added).

*Nat'l Fed'n of Indep. Bus. v. Dep't of Lab., Occupational Safety & Health Admin.*, 142 S. Ct. 661, 665–66 (2022).  Due to the nature of Plaintiffs' jobs, they had no greater chance of spreading COVID-19 than the general public.  Their job duties did not bring them into contact with immunocompromised medical patients, as might be the case with nurses and doctors, or otherwise involve a higher risk of spreading the disease than might exist in the general public.

63.     Plaintiffs did not pose a direct threat to the public or their co-workers. In the context of reasonable accommodation, "[d]irect [t]hreat means a significant risk of substantial harm to the health or safety of the individual or others that cannot be eliminated or reduced by reasonable accommodation." 29 C.F.R. § 1630.2(r). "The determination … shall be based on an individualized assessment of the individual's present ability to safely perform the essential functions of the job" and "a reasonable medical judgment that relies on the most current medical knowledge and/or on the best available objective evidence." *Id.* "In determining whether an individual would pose a direct threat, the factors to be considered include: (1) The

duration of the risk; (2) The nature and severity of the potential harm; (3) The likelihood that the potential harm will occur; and (4) The imminence of the potential harm." *Id.*

64.    HSUS allowed Plaintiffs to maintain employment through part or all of the COVID-19 pandemic until the dates of their termination.  At no point did HSUS inform Plaintiffs that they posed a direct threat to the public or their co-workers. HSUS found ways to mitigate against the threat posed by COVID-19, such as mask policies, social distancing, testing, and remote work.  Plaintiffs did not present a direct threat in failing to comply with HSUS's vaccine policies and HSUS certainly could have continued the mitigation measures it and many other employers had previously employed.  HSUS bears the burden of proving that Plaintiffs posed a "direct threat" and cannot meet that burden, especially since it used Finn's services for almost two years when she was not vaccinated.  Nothing changed in January 2022 to indicate that Finn was posing a greater threat to others than during the prior two years.  In addition, HSUS continued to interview candidates such as Muldoon without requiring candidates to submit to vaccination.

65.    As a result of the above-mentioned discrimination, Plaintiffs suffered and will continue to suffer lost earnings, earning capacity, fringe benefits, severe emotional distress and mental anguish.  HSUS is also liable for punitive damages because its conduct was intentional and malicious.

## COUNT III
## DISABILITY DISCRIMINATION
## UNDER THE AMERICANS WITH DISABILITIES ACT
## (REGARDED AS DISABLED)
## (42 U.S.C. § 12101 *et seq.*)

66.     Plaintiffs incorporate by reference the allegations set forth in the Paragraphs above, as if fully set forth herein.

67.     Under the 2008 amendments to the ADA, an individual is "regarded as" disabled when she is perceived as having a physical or mental impairment, regardless of whether the impairment actually exists or is perceived to limit a major life activity. 42 U.S.C. § 12102(3)(A). An individual cannot be "regarded as having such an impairment," however, if the impairment is "transitory and minor." *Id.* § 12102(3)(B). "A transitory impairment is an impairment with an actual or expected duration of 6 months or less." *Id.*  Thus, "an employee has a 'disability' under the ADA when that employee actually has, or is perceived as having, an impairment that is not transitory and minor." *EEOC v. STME, LLC*, 938 F.3d 1305, 1314 (11th Cir. 2019).  "Importantly, what matters for the 'regarded as' theory is whether the [employer] perceived [the plaintiff] as impaired, not whether he was actually impaired." *Forsyth v. Univ. of Alabama, Bd. of Trustees*, No. 20-12513, 2021 WL 4075728, at *4 (11th Cir. Sept. 8, 2021).  This "'more liberal standard'" makes "'it significantly easier for a plaintiff to show disability.'" *Coker v. Enhanced Senior Living, Inc.*, 897 F.Supp.2d 1366, 1374 (N.D. Ga. 2012) (quoting *Barlow v.*

*Walgreen Co.*, No. 8:11–cv–71–T–30EAJ, 2012 WL 868807, at *4 (M.D.Fla. Mar. 14, 2012)).

68.    At the time that Plaintiffs were terminated, HSUS regarded them as disabled because they had the medical status of being unvaccinated. This condition was neither transitory nor minor.  At one time, limitations had been placed on unvaccinated individuals that limited one or more of life's major activities. Unvaccinated individuals were:

a.  prohibited from going into many private and public buildings,

b.  barred from restaurants and bars,

c.  prohibited from working in medical facilities such as hospitals, fire departments, doctor's offices, etc.,

d.  required for periods of time to "shelter in place,"

e.  required to remain distanced from other people,

f.  required to refrain from attending any sort of gathering of people,

g.  required to avoid going to parties, meetings, church services, etc.,

h.  prohibited from worshiping God in their usual manner, such as attending church, synagogue, mosques, and temples,

i.  prohibited from playing sports, even sports such as tennis, that required social distancing,

j.  attending in person governmental meetings such as school board meetings, legislative sessions, court proceedings, etc.

k.  required by many business establishments to prove that they were vaccinated before obtaining services from such establishments,

l.  prohibited from flying on commercial airlines.

69.    HSUS terminated Plaintiffs employment because it regarded them as disabled.    They were "regarded as" disabled by HSUS due to their status as unvaccinated.   42 U.S.C. § 12102(3).   HSUS considered vaccinated employees "clean" and unvaccinated employees "unclean."   HSUS also regarded unvaccinated employees as "disabled."

70.    The assumptions made by HSUS regarding Plaintiffs' unvaccinated status were not based on any reasonable understanding of the facts regarding Plaintiffs' ability to perform the essential functions of their positions.   HSUS regarded Plaintiffs as unable to perform the essential functions of their positions solely because they were unvaccinated.  However, Plaintiffs had demonstrated their ability to perform the essential functions of their positions, with or without accommodations.   Assuming for the sake of argument that Plaintiffs required accommodations, those accommodations were the same accommodations that had been granted them until their termination dates, and they were able to perform the essential functions of their positions during that time.

71.     Finn was a remote worker for years prior to the pandemic, and Muldoon was a remote worker from the time of her hiring.  Despite their ability to do their jobs, with or without reasonable accommodations, HSUS terminated Plaintiffs because HSUS regarded Plaintiffs as disabled.

72.     As a result of the above-mentioned discrimination, Plaintiffs suffered and will continue to suffer lost earnings, earning capacity, fringe benefits, severe emotional distress and mental anguish.  HSUS is also liable for punitive damages because its conduct was intentional and malicious.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiffs request relief as follows:

a.      For Plaintiffs to be reinstated to their positions or a similar one and receive all economic losses resulting from the unlawful termination, including but not limited to back pay, liquidated damages, front pay, reinstatement of accrued benefits including but not limited to sick pay, pension accrual, vacation pay and other employment benefits, in an amount that exceeds $75,000.

b.      For HSUS to be enjoined from further illegal discriminatory acts against Plaintiffs.

c.      For Plaintiffs' other non-economic and economic losses both retrospective and prospective as proved at trial including, but not limited to, damages

resulting from mental anguish and economic hardship of an amount more than $75,000.

       d.     For punitive damages in excess of $75,000,

       e.     For the cost of this suit and reasonable attorney's fees, including under 42 U.S.C. § 1988; and

       f.     For other and further relief as may be requisite.

                        Respectfully submitted,

                        **KAHN, SMITH & COLLINS, P.A.**

                        By:
                        _____/s/_____
                          Francis J. Collins, Esq.
                          CPF ID No. 8501010118
                          Fed Ct. # 04272
                          fjcollins@kahnsmith.com
                          201 N. Charles Street, Tenth Floor
                          Baltimore, Maryland 21201
                          (410) 244-1010 (telephone)
                          (410) 244-8001 (fax)

## PRAYER FOR JURY TRIAL

Finn and Muldoon, by their attorneys, Francis J. Collins and Kahn, Smith and Collins, P.A., pray to have this case tried by jury.


_____/s/_____
Francis J. Collins, Esq.